Linda Carol **NESMITH**, Appellant,

v.

Brian B. **BERGER**, Appellee.

No. 03–00–00686–CV.

Court of Appeals of Texas, Austin.

Aug. 9, 2001.

John F. Campbell, Mark W. Clemens, Campbell & Morgan, P.C., Austin, for appellant.

Richard R. Orsinger, San Antonio, Philip C. Friday, Jr., Austin, for appellee.

Before Justices KIDD, B.A. SMITH and PURYEAR.

## ON MOTION FOR REHEARING

BEA ANN SMITH, Justice.

Our opinion and judgment issued on June 29, 2001 are withdrawn, and the following opinion is substituted.

This appeal involves the dissolution of Linda Nesmith's marriage to Brian Berger, a marriage of less than five years that was filled with financial negotiations and contractual arrangements. The sole dispute regards Nesmith's interest in the marital residence on Hedge Lane in Austin. To address this issue, the trial court was required to review a premarital "agreement to agree," a postnuptial agreement, the real estate documents surrounding the purchase of the home as Berger's separate property, a second deed from Berger conveying the property to both

Berger and Nesmith in undivided interests, and an executed "buy-in" agreement with a subsequent addendum attempting to define the parties' joint ownership interests in the residence following the second deed.

The trial court awarded Nesmith $50,882 in lieu of her interest in the Hedge Lane property. Dissatisfied with this award, Nesmith attacks the postnuptial contract as unenforceable, complains that the trial court improperly divested her of separate property when it should have ordered a partition sale of the property, and improperly considered Nesmith's failure to pay her share of residential obligations after separation when the court granted exclusive possession of the home to Berger. After reviewing all of the real estate documents and agreements of the parties and considering which issues were preserved at trial, we hold that the trial court did not abuse its discretion in awarding Nesmith $50,882 in lieu of her interest in the marital residence.

## FACTUAL AND PROCEDURAL BACKGROUND

Both parties desired a prenuptial agreement. When they were unable to agree on the terms before the wedding, they agreed that they would execute a postnuptial agreement, which they did. This marital agreement provided that all income earned by either spouse or from either spouse's separate property would remain that party's separate property. The marital agreement further provided that the spouses would contribute to joint living expenses roughly in proportion to their earnings, as reflected on the separate income tax returns they agreed to file annually.

Each party owned a residence before marriage. Berger used the proceeds from the sale of his former residence to buy the Hedge Lane house that became the marital residence. The deed recited that title to the house was taken as his separate property and he alone signed the mortgage. When Nesmith sold her former residence, she "bought in" to the marital residence to escape capital gains taxes. There was a second deed from Berger as grantor conveying the property to husband and wife in undivided interests. This was followed by two agreements attempting to define the parties' joint ownership in the property. The first, signed the same day as the second deed, reflected that Nesmith paid approximately thirty percent of the down payment contributed by Berger, would receive a thirty-percent interest in the Hedge Lane property, and would be responsible for thirty percent of the mortgage and taxes, as between the parties.[1] Nesmith alone signed an addendum about two months later detailing her contributions and providing that the parties would make pro rata contributions to the expenses of Hedge Lane, in accordance with the marital agreement.

## DISCUSSION

### I. Validity of the Postnuptial Agreement

Nesmith first complains on appeal that the postnuptial agreement was not valid and enforceable because she did not sign it voluntarily. The agreement was the result of lengthy negotiations that started shortly after Nesmith and Berger became engaged in 1991. Nesmith had been married three times before and had no children. Berger's first marriage ended in a bitter

---

1. According to the second deed, Nesmith did "not assume payment of the note or liability under any instrument securing it."

divorce, which came before this Court in 1992.[2] Evidence at trial indicated that Nesmith wanted an agreement to protect her property from Berger's ex-wife or any claims by the children of that marriage.

In early 1992, Berger and Nesmith began negotiating a premarital agreement. Relying on a "prenuptial agreement kit," Nesmith and Berger drafted at least seven versions of an agreement.[3] The parties could not agree, however, on a final version before the wedding, so they entered a handwritten premarital agreement stating that "[i]t is our intention to have a post-nuptial agreement completed by June 12th." They married on May 16, 1992.

On May 18, Berger gave Nesmith a letter he wrote prior to the wedding, expressing concern that Nesmith had not yet signed an agreement. In the letter Berger questioned Nesmith's faith and trust in him. He wrote, "I believe I have extended all the trust I can and now it is up to you to show some courage and reciprocate. June 12th is a firm deadline in my mind and will mark a turning point in our relationship." Nesmith testified that Berger did not come home on May 19 or 20, and that on May 21, "he came home and said, I am not going on our honeymoon until you sign something."

On May 21, both Nesmith and Berger signed a typewritten postnuptial agreement entitled "Marital Contract." Both signatures were notarized, although Nesmith testified that she did not sign in the presence of a notary and that Berger took the document after she had signed it to be notarized by his receptionist. The postnuptial agreement refers to twelve appen-dices, not all of which appear in the record. Berger testified that at the time the parties signed the agreement all of the appendices were attached. Nesmith testified, however, that she never saw the document with all of the appendices attached.

After the honeymoon, both parties followed the terms of the postnuptial agreement. Nesmith testified that she and Berger complied with the agreement with regard to sharing expenses. She explained that each year they filed separate tax returns reflecting their own earnings and used these tax returns from the previous year to calculate the percentages each would contribute for common living expenses in the coming year.

■ The trial court made a finding of fact that the parties entered into a valid, enforceable, and binding postnuptial agreement on May 21, 1992. Nesmith challenges this finding, arguing that Berger pressured her to sign an agreement she thought was invalid by threatening not to go on the honeymoon.

Family Code section 4.105(a)(1) provides that a partition or exchange agreement between spouses is not enforceable against a party if that party did not sign the agreement voluntarily. Tex. Fam.Code Ann. § 4.105(a)(1) (West 1998). Nesmith urges that "voluntarily" means that an action is taken by design, intentionally, purposely, by choice, of one's own accord, or by the free exercise of will. See *Prigmore v. Hardware Mut. Ins. Co. of Minn.*, 225 S.W.2d 897, 899 (Tex.Civ.App.—Amarillo 1949, no writ).

**2.** *Berger v. Berger*, No. 03–90–00093–CV (Tex. App.—Austin June 17, 1992) (not designated for publication), *rev'd*, No. D–3153, 1993 WL 165438 (Tex. May 19, 1993) (not designated for publication), 1993 Tex. LEXIS 64. After much post-divorce wrangling, Berger termi-nated his parental rights to the children from his first marriage.

**3.** Six preliminary versions of the agreement appear in the record, plus the final version.

The burden of proof is on the person attempting to prove that the agreement was not signed voluntarily. Tex. Fam.Code Ann. § 4.105(a)(1); *Matelski v. Matelski*, 840 S.W.2d 124, 128 (Tex.App.—Fort Worth 1992, no writ). Findings of fact are reviewed for legal and factual sufficiency of evidence. *Westech Eng'g, Inc. v. Clearwater Constructors, Inc.*, 835 S.W.2d 190, 195 (Tex.App.—Austin 1992, no writ). When the legal sufficiency of a fact finding is challenged by the party who had the burden of proof on that issue at trial, we first examine the evidence that supports the finding and ignore all evidence to the contrary. *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex. 1989). Then, if there is no evidence to support the fact finding, we must examine the entire record to see if the contrary position is established as a matter of law. *Id.* In reviewing a finding for factual sufficiency, we must consider and weigh all the evidence. *Matelski*, 840 S.W.2d at 128. If the trial court's finding is so contrary to the great weight and preponderance of the evidence as to be manifestly unjust, the challenge should be sustained, even if there is some evidence to support the fact-finding. *Id.* at 128–29.

By her point of error, Nesmith challenges the trial court's failure to find that she involuntarily signed the postnuptial agreement. The great weight and preponderance of the evidence that we have outlined—of the parties' mutual desire to enter into a marital property agreement, Nesmith's desire to protect her property from the children of Berger's first marriage, the parties' inability to agree upon the final terms of an agreement prior to the marriage, their expressed intent to execute such an agreement after marriage, Berger's declaration of the honeymoon as a deadline for finalizing the terms, the parties' compliance with the agreement in reporting income tax and allocating between themselves their annual living expenses—does not convince us that the court's decision to enforce the agreement is shocking to the conscience. In light of the bargaining that accompanied every step of the relationship between the parties before and during their marriage, we cannot say that Berger's proposed bargain to finalize the terms of the long-contemplated agreement before leaving on a honeymoon exerted such undue influence as to deprive Nesmith of her free will in signing the agreement. *See id.* at 130 (in light of husband's bargain to sign a partition agreement in exchange for wife's consent to procure permanent financing on a lake house, trial court's failure to find husband's agreement involuntary is not against the great weight and preponderance of the evidence).

Nesmith next claims that the agreement she signed did not have the appendices attached, which were meant to be an integral part of the agreement. She posits that because those items were missing, the contract was invalid because as long as negotiations are incomplete, there is no contract. *See Brillhart v. Beever*, 198 S.W. 973, 975 (Tex.Civ.App.—Amarillo 1917, no writ). She urges that for an agreement to be finally settled, it must comprise all the terms that the parties intended to introduce into the agreement. *See id.* Nesmith testified she never saw the appendices attached, while Berger told the court that the document was complete when they signed it. Berger's testimony was legally sufficient to prove that the contract was complete.[4] Even looking at

---

**4.** Berger testified that Nesmith took the agreement with her when she left him and that it was intact when she took it, but that it had been taken apart when she returned it during the divorce proceedings.

the entire record on this point, including Nesmith's testimony, the fact-finding is not contrary to the great weight and preponderance of the evidence. Indeed, Nesmith faithfully ratified the agreement each year by performing according to its terms. We overrule Nesmith's first point of error.

## II. Partition of the Hedge Lane House

Nesmith next complains that the trial court divested her of separate property by awarding her a money judgment for the value of her interest in the Hedge Lane house rather than ordering a partition sale of the property. In May 1993, Berger purchased the house on Hedge Lane. Berger paid the down payment from his separate property, and he alone signed the note for the remainder of the purchase price.

In September 1995, Nesmith and Berger executed a buy-in agreement, acknowledging Nesmith's interest in the Hedge Lane house. This agreement states: "The home was purchased by Brian as his separate property on 30 April 1993 for $611,429. Linda is purchasing a 30% share effective 29 September 1995. Linda is purchasing this 30% share for $189,000.... Linda assumes 30% liability for the note ... as well as 30% of taxes owed...." On the same day, Berger signed a general warranty deed conveying the property to "Brian B. Berger and Linda Nesmith Berger." This second deed provides that grantees do not "assume payment of the note or liability under any instrument securing it." Although Nesmith was not liable to the lender on the mortgage, she assumed liability to Berger for thirty percent of the mortgage payments and tax liability under the buy-in agreement. On December 7, Nesmith signed an addendum to the buy-in agreement laying out the details of her contributions. It provided that her initial buy-in was thirty percent of Berger's down payment of $126,000, amounting to $37,800, made in the form of improvements and repairs to the property. The addendum further provided that the parties would make pro rata contributions to the expenses of the Hedge Lane house and that these would be used to maintain "a running record of pro rata home equity."

### A. Nesmith's Interest in the Property

■ Nesmith challenges the trial court's finding of fact that Berger initially "acquired as his sole and separate property a residence for the parties on Hedge Lane." She agrees that Berger acquired part of the house as his separate property when he paid $126,000 from his separate funds as a down payment. She alleges that because the note for the remainder of the purchase price was made during the marriage, it was presumptively made on community credit, and the note failed to specify that the lender agreed to look only to Berger's separate property for payment. *See Sprick v. Sprick*, 25 S.W.3d 7, 13 (Tex. App.—El Paso 1999, pet. denied) ("[D]ebts contracted during the marriage are presumed to be on the credit of the community and thus are community obligations, unless it is shown that the creditor agreed to look solely to the separate estate of the contracting spouse for satisfaction."). Therefore, she contends, the house was partly community property to the extent of the community debt. *See Gleich v. Bongio*, 128 Tex. 606, 99 S.W.2d 881, 883 (1937) ("[P]roperty acquired on the credit of the community is community property."). This presumption must be overcome by clear and convincing evidence. Tex. Fam.Code Ann. § 3.003(b) (West 1998); *Sprick*, 25 S.W.3d at 13.

Nesmith cites *Gleich* for the proposition that their postnuptial agreement does not affect the character of the property because the "mere intention of the husband

and wife cannot convert property purchased with an obligation binding upon the community into the separate estate of either spouse." *Gleich,* 99 S.W.2d at 884. *Gleich* holds that to avoid creating community debt, "the vendor must have agreed with the vendee to look only to his separate estate for the satisfaction of the deferred payments." *Id.* Nesmith essentially contends that the mortgage signed by Berger lacks the "magic words" stating that the creditor agreed to look solely to Berger's separate property for satisfaction.

▆▆▆ A question of fact is raised as to the character of the property when the documentary evidence fails to reflect an express agreement by the lender to look only to the purchasing spouse's separate estate for payment. *See Glover v. Henry,* 749 S.W.2d 502, 503 (Tex.App.—Eastland 1988, no writ). We must look to the totality of the circumstances in which the debt arose to determine the character of the debt. *Cockerham v. Cockerham,* 527 S.W.2d 162, 171 (Tex.1975). Evidence showing, for example, that the down payment was paid with separate funds, and the parties agreed that the property would remain separate property and the balance of the debt was to be paid from separate funds is sufficient to overcome the presumption of community debt. *Foster v. Christensen,* 67 S.W.2d 246, 249 (Tex. Comm'n App.1934, holding approved). "The effect of such proof would not be altered by the fact that the [non-purchasing spouse] joined in the promise to pay the balance of the purchase money." *Id.*

Here, Nesmith herself sought to enter an agreement that maintained the status of her separate property, including property acquired after marriage. The postnuptial agreement assured that this purpose was achieved and that there would be no community income and essentially no community property. As a result, a creditor would be unable to look to any community property for satisfaction of the note because none existed. In addition, Berger alone signed the note, and Nesmith signed the deed of trust "pro forma," which recited: "BRIAN B. BERGER AND LINDA C. NESMITH, PRO FORMA FOR THE REASON THAT THE PROPERTY DESCRIBED HEREIN IS THE SOLE AND SEPARATE PROPERTY OF BRIAN B. BERGER." We hold that these facts are legally and factually sufficient to support the trial court's finding of fact that the Hedge Lane house was initially acquired as Berger's sole and separate property. Under these circumstances, Berger successfully defeated the presumption of community credit, even though the note lacked the "magic words." We overrule Nesmith's second point of error. We next address how the buy-in agreement and second deed affected the parties' interest in the Hedge Lane property.

▆▆▆ Berger asserts that we should view Nesmith's buy-in agreement as creating a partnership. The untitled agreement reads: "This is to document the partnership agreement between Brian B. Berger and Linda Nesmith Berger regarding their *joint ownership* of the residence at 9 Hedge Lane ...." (Emphasis added.) Nesmith responds that Berger did not argue a partnership theory at trial, and therefore, he cannot raise it on appeal. *See Carrizales v. Tex. Dep't of Protective & Regulatory Servs.,* 5 S.W.3d 922, 925 (Tex.App.—Austin 1999, pet. denied). In our review of the record, we find that Berger never asserted to the trial court that the property was owned by a partnership. At best, he referred to the document as the "partnership agreement," but he did not advance the legal argument he asserts here. The argument, therefore, is waived. *See id.*

■ Even had he asserted a partnership theory to the trial court, the agreement did not meet the requirements of establishing a partnership. *See* Tex.Rev. Civ. Stat. Ann. art. 6132b–2.03 (West Supp.2001) ("Rules for Determining if Partnership is Created"). Article 6132b–2.03(b) lists circumstances *not* indicating creation of a partnership, including joint ownership of property, which is exactly what the buy-in agreement established. *See id.* art. 6132b–2.03(b)(2). A label used by lay people does not define a partnership. *Cf. id.*

■ The trial court found that the buy-in agreement and the addendum "concerning the Hedge Lane residence ... are valid and enforceable." In a separate finding of fact, the trial court concluded that Nesmith "is entitled to receive from [Berger] the sum of $50,882 in lieu of her interest in said property." The trial court did not characterize Nesmith's interest in the Hedge Lane house as separate or community property.[5] In a conclusion of law, the trial court determined that the award of $50,882 to Nesmith "does not constitute a divestiture of separate property."

Nesmith attacks this conclusion of law, stating that the trial court divested her of her separate property interest[6] in the house by awarding her a money judgment for the value in the house and by not ordering the property sold. She cites to *Eggemeyer v. Eggemeyer*, 554 S.W.2d 137 (Tex.1977), for the proposition that the trial court cannot divest her of her separate property interest. *Eggemeyer* holds that while a trial court has wide latitude in the division of community property, it has no discretion to take the separate property of one spouse and donate it to the other. *Id.* at 142.

■ We need not address the characterization of the property to resolve this issue. At the close of the trial, Nesmith never asked the court to partition the Hedge Lane property. She cannot now complain on appeal that the trial court failed to partition the property. Nesmith relies on the fact that she once filed a suit for partition and that somehow that suit was consolidated with the divorce proceeding. Although Nesmith's attorney asserted in oral argument to the trial court that he thought the two had been consolidated, we find in the record no motion to consolidate the suit for partition with the suit for divorce. Assuming the two suits were consolidated, however, Nesmith only asked the trial court to award her the monetary equivalent of her equity interest in the residence. The dispute was about the size of her equity interest, not about remedies. In her proposed disposition of the property, Nesmith asked for one-half of the equity in the house. At the end of the trial, the judge asked Nesmith's counsel what remedy she sought if the court upheld the

---

5. This failure to characterize the property interest has not been challenged in the trial court or on appeal.

6. Berger argues that Nesmith, under oath, testified at trial that the Hedge Lane property was community property. He maintains that she cannot on appeal urge that she has a separate property interest in the house. *See Baptist Mem'l Hosp. Sys. v. Smith*, 822 S.W.2d 67, 73 (Tex.App.—San Antonio 1991, writ denied) (holding that a litigant cannot take one position in trial and an inconsistent position on appeal). We refuse, however, to rely on a lay person's testimony on the legal characterization of property to hold she waived argument as to other legal theories. In Nesmith's proposed disposition of issues, Nesmith not only proposed a division of community property, but she asked the trial court: "[I]n the event [the Hedge Lane house] is not found to be community property, then one-half is my separate property by Deed from BRIAN B. BERGER." This is sufficient for Nesmith to urge on appeal that she has a separate property interest.

postnuptial agreement. Nesmith's counsel answered that "we would have to say that it's 30 percent to Linda Nesmith and 70 percent to Brian Berger." When asked about the value of that percentage, counsel answered that it was worth $120,000. Counsel did not request a partition of the real property or the appointment of a receiver. A party that asks for a certain type of relief cannot complain on appeal if that relief is granted. *Litton Indus. Prods., Inc. v. Gammage*, 668 S.W.2d 319, 321–22 (Tex.1984). Nesmith asked the trial court to award her equity based on her percentage interest in the house; she did not request a partition when the trial court asked what remedy she sought. That was the time to ask for partition of the property. Nesmith cannot now seek a partition on appeal because she is unhappy with the amount of equity awarded by the trial court. *See id.* We overrule Nesmith's fourth point of error.

**B. Deduction of mortgage and tax payments**

■ Finally, Nesmith complains that the trial court erred in deducting from her monetary judgment thirty percent of the mortgage and tax payments that came due after Nesmith moved out of the house. Nesmith could have argued that as a cotenant she was entitled to an offset for her constructive ouster from the property after the parties separated. Nesmith's counsel, however, conceded at oral argument that this theory was never urged to the trial court. Nesmith, instead, refers us to certain comments the judge made at the close of the trial to show that these deductions figured into the trial court's calculation of the monetary award.

The trial judge made a finding of fact that Nesmith was "entitled to receive from [Berger] the sum of $50,882 in lieu of her interest in said property." The supreme court has held that an appellate court may not look to comments a judge makes at the conclusion of a bench trial as a substitute for findings of fact and conclusions of law. *In re W.E.R.*, 669 S.W.2d 716, 716 (Tex. 1984). Because we may not consider those comments apart from a finding of fact reflecting the court's actual calculations, we are unable to address Nesmith's complaint regarding the deduction. We overrule the third point of error.

### CONCLUSION

We uphold the trial court's findings that the postnuptial agreement was valid and enforceable and that the Hedge Lane property was initially held as Berger's separate property. We affirm the conclusion that the monetary judgment awarded to Nesmith for her later-acquired equity in that home did not constitute a divestment of her separate property. Based on the agreements of the parties, we conclude that the trial court did not abuse its discretion in awarding Nesmith $50,882 in lieu of her interest in the marital residence. Therefore, we affirm the judgment of the trial court.